UNITED STATES *v.* FRAME & CO. ET AL. (No. 2595) [1]

EXPORTATION OF CONDEMNED FOODS AND DRUGS—EXPENSES—SALARIES FOR SUPERVISING—"LABOR."

Section 11, food and drug act of June 30, 1906, provides that "all charges for storage, cartage, and labor" on imported foods and drugs refused admission or delivery, under it by the Secretary of Agriculture shall be paid by the owner or consignee. Article 499, Customs Regulations 1923, is to the same effect. Salaries of Government inspectors detailed to supervise the exportation of such goods are not within the meaning of the word "labor."

United States Court of Customs Appeals, March 13, 1926

APPEAL from Board of United States General Appraisers, Abstract 49028

[Affirmed.]

*William W. Hoppin* and *Charles D. Lawrence*, Assistant Attorneys General (*Jerome G. Clifford*, special attorney, of counsel), for the United States.
*Walden & Webster* (*Walter F. Welch* of counsel) for appellees.

[Oral argument January 20, 1926, by Mr. Lawrence and Mr. Welch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the Board of General Appraisers sustaining the protests of importers against certain charges and exactions assessed against them by the collector. The

---

[1] T. D. 41457.

assessments complained of were made to cover the regular salaries of Government inspectors for the time they were detailed to supervise the exportation of imported merchandise, which, being unfit for human consumption, had been refused admission into the commerce of the United States in accordance with the provisions of section 11 of the food and drugs act of June 30, 1906, which reads as follows:

SEC. 11. The Secretary of the Treasury shall deliver to the Secretary of Agriculture, upon his request from time to time, samples of foods and drugs which are being imported into the United States or offered for import, giving notice thereof to the owner or consignee, who may appear before the Secretary of Agriculture, and have the right to introduce testimony, and if it appear from the examination of such samples that any article of food or drug offered to be imported into the United States is adulterated or misbranded within the meaning of this act, or is otherwise dangerous to the health of the people of the United States, or is of a kind forbidden entry into, or forbidden to be sold or restricted in sale in the country in which it is made or from which it is exported, or is otherwise falsely labeled in any respect, the said article shall be refused admission, and the Secretary of the Treasury shall refuse delivery to the consignee and shall cause the destruction of any goods refused delivery which shall not be exported by the consignees within three months from the date of notice of such refusal under such regulations as the Secretary of the Treasury may prescribe: *Provided*, That the Secretary of the Treasury may deliver to the consignee such goods pending examination and decision in the matter on execution of a penal bond for the amount of the full invoice value of such goods, together with the duty thereon, and on refusal to return such goods for any cause to the custody of the Secretary of the Treasury, when demanded, for the purpose of excluding them from the country, or for any other purpose, said consignee shall forfeit the full amount of the bond: *And provided further*, That all charges for storage, cartage, and labor on goods which are refused admission or delivery shall be paid by the owner or consignee, and in default of such payment shall constitute a lien against any future importation made by such owner or consignee.

Article 499 of the Customs Regulations, 1923, reads as follows:

ART. 499. INSPECTION SERVICE—EXPENSES.—Collectors of customs will perform the inspection service whenever goods are to be exported or destroyed and in other cases when there is no officer of the station available.

Collectors of customs and representatives of the station will confer and arrange the apportionment of the inspection service according to local conditions. Officers of the station will, whenever feasible, perform the inspection service when cleaning, bringing up to standard and like reconditioning operations are involved.

Expenses for storage, cartage, and labor arising from the detention for inspection and analysis of goods admitted to entry will be borne by the Government, and bills therefor will be rendered to the Secretary of Agriculture; but all charges for storage, cartage, and labor on goods which are refused admission or delivery shall be paid by the owner or consignee.

It will be noted that the customs regulations require the collectors to perform the service of supervision in the exportation or destruction of merchandise in the event that it is refused admission into the commerce of the United States, and that "expenses for storage,

cartage, and *labor arising* from the detention for inspection and analysis of goods admitted to entry will be borne by the Government," but that "all charges for storage, cartage, and *labor on goods* which are refused admission or delivery shall be paid by the owner or consignee." (Italics ours.)

It appears from the collector's report that "the charges for the exaction forming the subject of" the protests "were made to cover the expense incurred in supervising the outward shipment of certain food products rejected and refused admission into the United States by the Department of Agriculture under the food and drugs act of June 30, 1906. * * * The amount collected represents the *salary* paid the *lading inspectors* detailed to *supervise* the export" of such merchandise. (Italics ours.)

The Board of General Appraisers held that the salaries of Government inspectors accruing during supervision of the exportation of rejected merchandise did not come within the provision for "labor on goods," and were, therefore, not proper charges to be made against the importers. Accordingly, the protests were sustained.

It is claimed by the Government that the services rendered by the Government inspectors were extraordinary; that the benefits derived from such supervision accrued entirely to the importers; that the expenses thus incurred by the Government were not such as were ordinarily occasioned by the entry and passing of merchandise through the customs; and that the salaries of the Government inspectors accruing during the supervision of the exportation of the rejected merchandise were proper charges against the importers. It is further claimed that the following cases support the contentions of the Government: *In re Blanchard Lumber Co. et al.*, G. A. 7163, T. D. 31271; *Arbuckle Bros.* v. *United States*, 3 Ct. Cust. Appls. 105, T. D. 32362.

It is contended by counsel for the appellees that charges for the expense incurred by the Government for cartage, storage, and labor performed in handling the goods are proper charges to be assessed against the appellees; but that the Government inspectors were present for the purpose of supervising the exportation of the merchandise, to protect the revenues of the United States, and to prevent any of such merchandise from entering the commerce of the country; and that such service does not come within the provision for "labor on goods."

In the consideration of this case it should not be forgotten that the merchandise against which the charges were assessed was refused admission into the commerce of the United States; and that, unless it was exported by the owner or consignee within three months from the notice of such rejection, the Secretary of the Treasury was required by the provision of section 11, *supra*, to cause its destruction.

Accordingly, we must look to the provisions of section 11, *supra*, and article 499 of the Customs Regulations, *supra*, in order to determine the legality of the charges in question.

In the *Blanchard Lumber Co.* case, *supra*, a cargo of lumber arrived in Northport, L. I. Permission was granted by the collector to discharge the cargo at Northport, which was within the port of New York. The collector assigned watchmen and other customs officers to take charge of the vessel and superintend the unlading of the cargo, and charge the importers with an amount sufficient to reimburse the Government for the compensation and expenses of such officers.

It was claimed by the importers that the collector had no authority to make the charges.

The Board of General Appraisers held that section 2776 of the Revised Statutes as amended by the act of June 26, 1884, 23 Stat. 60, authorized the charges in question and overruled the protest. The amendment to section 2776 of the Revised Statutes read as follows:

Sec. 2776. * * * *Provided*, That vessels arriving at a port of entry in the United States, laden with coal, salt, railroad iron, and other like articles in bulk, may proceed to places within that collection district to be specially designated by the Secretary of the Treasury, by general regulations or otherwise, under the superintendence of customs officers, at *the expense of the parties interested*, for the purpose of unlading cargoes of the character before mentioned. (Italics ours.)

In accordance with the provisions of this statute, and the Treasury regulations adopted in pursuance thereto, it was held by the board that the Government was entitled to be reimbursed for all reasonable and proper expense incurred in giving such extraordinary service.

In the case of *Arbuckle Bros.* v. *United States*, *supra*, it appears that a cargo of sugar was transferred to lighters and thence conveyed to the wharf of the importers, which was within the limits of the port of New York. Government officers were assigned by the collector to superintend the transfer of the cargo from the vessel to the lighters and the unlading at the importers' wharf. The expense thus incurred by the Government was assessed against the imported merchandise, and upon appeal, this court held that such charges were proper under the provisions of section 2776, *supra*.

It will be observed that section 2776, *supra*, provided that the privileges therein granted to importers were to be carried out under the superintendence of customs officers, and *at the expense* of the importers.

The provisions of section 11, *supra*, and article 499, *supra*, are not so comprehensive. The Congress might well have provided that *all* expense incurred by the Government arising from the detention

for inspection of such rejected merchandise should be paid by the owner or consignee. It did not so provide. The expense to be paid by the owner or consignee was expressly limited to *storage, cartage,* and *labor on goods,* and, unless the work performed by the inspectors may be classed as labor on the exported merchandise, the charges therefor were not properly assessed against the appellees.

The collector has reported that the charges assessed represented the salaries paid the lading inspectors detailed to *supervise* the exportation of the merchandise. It is not claimed that these inspectors did anything more than superintend the work of exportation. They were there as representatives of the Government to see that the law was properly enforced and that the revenues and the commerce of the United States were protected. They may have performed extraordinary service and some physical and mental labor in connection therewith, but such labor, we think, can not be classed as labor on goods.

The judgment is *affirmed.*